Signed and Filed: March 11, 2013

_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Bankruptcy Case |
| | ) No. 08-32514DM |
| HELLER EHRMAN LLP, | ) |
| Liquidating Debtor. | ) Chapter 11 |
| | ) |
| HELLER EHRMAN LLP, | ) Adversary Proceeding |
| LIQUIDATING DEBTOR, | ) No. 10-3221DM |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JONES DAY, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM DECISION ON MOTIONS AND
CROSS-MOTIONS FOR SUMMARY JUDGMENT

I. INTRODUCTION

In 2010, plaintiff and debtor Heller Ehrman LLP (by and through its plan administrator, Michael Burkart) ("Heller" or "Debtor"), filed multiple adversary proceedings against various law firms to which Heller's former shareholders transferred, seeking to recover profits those firms earned while completing former Heller client matters that were pending but unfinished on the date of Debtor's dissolution. Many of these lawsuits have been settled, but the actions against four law firms remain

-1-

pending:  A.P. No. 10-3210 against Davis Wright Tremaine LLP ("Davis"), A.P. No. 10-3213 against Foley & Lardner LLP ("Foley"), A.P. No. 10-3221 against Jones Day ("Jones Day"), and A.P. No. 10-3234 against Orrick, Herrington & Sutcliffe, LLP ("Orrick"). Davis, Foley, Jones Day and Orrick are collectively referred to as "Defendants."  This Memorandum Decision is being filed in each of those four actions, with changes only in the caption.

Heller has filed motions for partial summary judgment ("MSJs") contending that as a matter of undisputed fact, it has established the existence of three elements of fraudulent transfer actions and the absence of an essential element of a "safe harbor" defense to such actions.  In addition to opposing the MSJs, Jones Day filed (and the other Defendants joined) cross-motions for summary judgment.  For the reasons set forth below, the court will grant Heller's MSJs and will deny the cross-motions.[1]

---

[1]  <u>Executive Benefits Ins. Agency v. Arkison</u> (<u>In re Bellingham Ins. Agency, Inc.</u>), 702 F.3d 553 (9th Cir. 2012), held that bankruptcy judges lack the authority to enter summary judgment on fraudulent transfer actions unless, among other things, the parties waive any objection to the court's doing so. Here, Defendants have waived any <u>Bellingham</u> objections by filing (or joining) the cross-motions for summary judgment.  In any event, following the issuance of <u>Bellingham</u>, no party has raised any objection to the court's authority to issue summary or partial summary judgment.

-2-

A.   *Procedural History*

Before its dissolution in September 2008, Heller was a global law firm with approximately 700 lawyers.  Heller was a limited liability partnership composed of eight partners, all of which were professional corporations (the "Heller PCs").  The shareholders of those corporations (the "Shareholders") provided the legal services to Heller's clients and delegated the management of Heller to officers and committees composed of Shareholders.

In September 2008, Bank of America declared Heller to be in default of its covenants relating to a $35 million revolving line of credit and a $10 million long-term loan, and eventually seized control of Heller's bank accounts.  As a result, the Heller PCs voted to dissolve the firm on or around September 26, 2008, pursuant to a written dissolution plan ("Dissolution Plan").  Heller notified clients that it would cease providing legal services on or before October 31, 2008.  Heller included in its Dissolution Plan a provision now commonly referred to as the "Jewel Waiver," waiving any rights and claims under the doctrine of *Jewel v. Boxer*, 156 Cal. App. 3d 171 (1994) ("*Jewel*") "to seek

---

[2]   As this memorandum decision resolves competing summary judgment motions, the court does not make findings of fact.  *See* Fed. R. Civ. P. 52(a) (incorporated by Fed. R. Bankr. P. 7052) (stating that findings of fact are unnecessary on decisions of motions under Rule 56); *see also Bothke v. Fluor Eng'rs & Constructors, Inc.*, 834 F.2d 804, 810 (9th Cir. 1987) (stating that the "district court was not entitled to make findings of fact" in the context of a summary judgment motion).  To provide context for its rulings, the court is setting forth the undisputed facts relevant to its decision.  While these facts may not be in dispute, the parties have markedly disparate views about their materiality and the legal conclusions to be drawn from them.

payment of legal fees generated after the departure date of any lawyer or group of lawyers with respect to non-contingency/non-success fee matters only."[3]

Thereafter, Heller's Dissolution Committee learned that its secured lenders had filed a financing statement with the Secretary of State in September. Recognizing that Heller could possibly avoid the liens under the Bankruptcy Code's preference provisions, Heller filed its Chapter 11[4] bankruptcy case in December 2008.

Heller's adversary proceedings against Defendants and other law firms allege that it is entitled to recover profits associated with unfinished Heller business because the Jewel Waiver was a

---

[3] The waiver states in full:

**F. Jewel v. Boxer.** As the Firm is no longer in a position to service its clients efficiently and as an inducement to encourage Shareholders to move their clients to other law firms and to move Associates and Staff with them, the effect of which will be to reduce expenses to the Firm-in-Dissolution, and to assure that client matters are attended to in the most efficient and effective manner possible, and to help ensure collection of existing accounts receivable and unbilled time with respect to such clients, the Firm-in-Dissolution will waive any rights and claims under the doctrine of *Jewel v. Boxer*, 156 Cal. App. 3d 171 (1984)[,] to seek payment of legal fees generated after the departure of any lawyer or group of lawyers with respect to non-contingency/non-success fee matters only and the Dissolution Committee is authorized to provide appropriate assurances to law firms that Shareholders may choose to join regarding this issue, provided, however, that the Firm-in-Dissolution reserves its right to seek indemnification from any such law firm with respect to actions taken after any such matters are transferred to such law firms.

*See* Dissolution Agreement at page 10, attached as Exhibit B to Jones Day's Request for Judicial Notice filed on February 22, 2011 (Docket 12-1 in A.P. No. 10-3221).

[4] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

-4-

constructively fraudulent transfer or an actually fraudulent

transfer under section 548 or under the California Uniform

Fraudulent Transfer Act. Heller has not sued the individual

Shareholders, who were the initial transferees and beneficiaries

of the Jewel Waiver.

Various defendant law firms (including those who have now

settled with Heller and the Defendants) filed motions to dismiss.

For the reasons set forth in the Memorandum Decision on Motion to

Dismiss (the "2011 Decision"),[5] the court denied the motions to

dismiss the claims based on constructive fraud and granted, with

leave to amend, the motions to dismiss the claims based on actual

fraud. Heller has amended its complaints accordingly.[6]

In June 2012, Heller filed the MSJs seeking a determination

as a matter of law and undisputed fact that:

> (1) the Jewel Waiver effected a transfer of the property of
> Heller to Defendants;
>
> (2) the Jewel Waiver was not given as part of a
> contemporaneous exchange in return for anything of value;
>
> (3) at the time of the Jewel Waiver, Heller could not pay
> its debts as they became due; and
>
> (4) no affirmative defense is possible under section
> 550(b)(1) or California [Civil] Code § 3439.08(b)(2).

In response, the two cross-motions for summary judgment

assert that as a matter of undisputed fact:

> (1) Heller did not transfer any cognizable property interest

---

[5] *Heller Ehrman LLP v. Arnold & Porter LLP (In re Heller Ehrman LLP),* 2011 WL 1539796 (Bankr. N.D. Cal. Apr. 22, 2011).

[6] Jones Day has filed a motion for summary judgment on the intentional fraud claims. That motion has been taken off calendar pending the court's resolution of the MSJs and the cross-motions that are the subject of this memorandum decision.

-5-

to the Defendants through the Jewel Waiver;

> (2)   Heller received "reasonably equivalent value" for any property that was transferred to the Shareholders by virtue of the Jewel Waiver; and

> (3)   To the extent the Defendants received any Heller property from the Shareholders, they are entitled to the safe harbor defense of section 550(b)(1).

The court bifurcated Heller's MSJs, hearing argument on issues (1) and (3) on October 15, 2012, and on issues (2) and (4) on November 28, 2012. Similarly, Defendants' first cross-motion (pertaining to the issue of whether the Jewel Waiver constituted a transfer of a property interest to them) was heard on October 15, and their second cross-motion (pertaining to the issues of whether Heller received reasonably equivalent value for the Jewel Waiver and whether they were entitled to the defense set forth in section 550(b)(1)) was heard on November 28, 2012.

B.   *Post-Petition Development:  The <u>Brobeck</u> Decision*

Approximately ten months after Heller's dissolution and the Jewel Waiver occurred, the court published a decision addressing issues of first impression: whether a trustee of a debtor law firm could set aside, as a fraudulent transfer, the firm's waiver of interests in profits realized or to be realized from unfinished partnership business. *Greenspan v. Orrick, Herrington & Sutcliffe (In re Brobeck, Phleger & Harrison LLP)*, 408 B.R. 318 (Bankr. N.D. Cal. 2009)("*Brobeck*"). Like the Jewel Waiver here, the Brobeck waiver was drafted to avoid the consequences of *Jewel*,[7] which held that in the absence of an agreement to the contrary, partners have

---

[7] After *Jewel* was decided, the Revised Uniform Partnership Act was enacted. Among other things it permitted partners to receive reasonable compensation for services rendered in winding up the partnership business.

-6-

a duty to account to the dissolved firm and their former partners for profits they earn on the dissolved firm's unfinished business.

The trustee in *Brobeck* sued both the former Brobeck partners and their new law firms. Most of the court's decision focuses on the liability of the former Brobeck partners for a constructively fraudulent transfer. In one paragraph (and without much analysis), the court stated that the partners' new law firms were immediate transferees who had not asserted any good faith defenses under section 550(b). *Brobeck*, 408 B.R. at 347.[8] Therefore, with one exception, the court granted partial summary judgment against the former partners and their new firms on the issue of whether the Jewel Waiver was a transfer made by the debtor for which it received less than reasonably equivalent value.

The court reserved for trial the amount of damages recoverable by the trustee. As the parties settled after the decision, no final judgment was entered and no appellate court has reviewed these issues. Before the court issued its *Brobeck* decision, there was no case law imposing fraudulent transfer liability following a Jewel Waiver or similar transaction on a former shareholder's or partner's new law firm.

---

[8] That paragraph reads:

As to the immediate transferee Firms, since some of the initial transferee Partner Defendants failed to provide value to Brobeck in exchange for the Jewel Waiver, and because the Firms have not asserted any good faith defense available under section 550(b) – taking for value without knowledge of the fraudulent transfer – the Trustee is entitled to partial summary judgment as to liability against the Firms on Claim 7. At trial, the Trustee must prove the amount he is entitled to recover, if any.

-7-

1   In support of its second cross-motion for summary judgment,
2   Jones Day filed a report and declaration of George Triantis, a
3   Professor of Law at Stanford Law School,[9] opining that in 2008,
4   before *Brobeck* was issued, no reasonably prudent law firm would
5   have believed that the Jewel Waiver effectuated a fraudulent
6   transfer to the Shareholders or that law firms that retained the
7   Shareholders would be liable to Heller under fraudulent transfer
8   law.   Triantis Declaration, Exh. A (Docket 127-3 in A.P. No. 10-
9   3221).

10  C.   *Concessions By Heller*

11      At both hearings on the MSJs, Heller's counsel conceded that
12  if a Shareholder had left Heller prior to the dissolution and had
13  taken unfinished business, Heller could not pursue recovery of
14  profits earned by that Shareholder following his or her departure,
15  absent some breach of fiduciary duty.   In particular, at the
16  hearing on October 15 (Transcript, Docket 142 in A.P. 10-3221, at
17  pages 105-106), the court asked Heller's counsel whether a partner
18  who took a big case would have to account for it.   Heller's
19  counsel stated the duty to account arose upon dissolution, but not
20  before, unless the departing attorney breached a fiduciary duty to
21  the firm:

22      THE COURT: How about if there wasn't a dissolution?

23      MR. SULLIVAN: If he breached his fiduciary duty.

24      THE COURT: How about if he just walked out the door and stole
        the client, took the client with him?  You know, the
25

26      [9] Professor Triantis indicates that his published scholarship
    has been primarily in the fields of bankruptcy, secured credit and
27  contracts, and that he has written several articles analyzing the
    law of fraudulent transfers.   Triantis Declaration, Exh. A,
28  paragraphs 1-3 (Docket 127-3 in A.P. No. 10-3221).

1  documents, the way I interpret it, said, as I stated earlier
   this afternoon, the client is a client of the firm.
2
                                  * * *
3  THE COURT: So if Mr. X or Ms. Y leaves and nobody cares,
   that's fine. But if somebody goes out the door with a big
4  fat case, did Heller or didn't it have the right to pursue
   that attorney predissolution?
5
   MR. SULLIVAN: Not in the absence of a breach of fiduciary
6  duty.
7  THE COURT: But was that itself a breach of duty?
8  MR. SULLIVAN: No
9  *See Id*. at pages 105-06.[10]

10     While Heller's counsel was not as direct on this issue at the

11 November hearing, he did not deny that a Shareholder who left

12 Heller prior to the dissolution, in the absence of a breach of

13 duty, would not have to account for unfinished business taken to

14 another firm. *See* Transcript of Hearing on November 28, 2012,

15 (Docket No. 173 in A.P. 10-3221, at pages 16-17). Moreover, he

16 acknowledged and did not dispute Defendants' allegation that prior

17 to its dissolution, Heller had never sued a former Shareholder

18 under a *Jewel* theory to recover the profits earned on such

19 unfinished business. Thus, only as a result of Heller's

20 _____

21     [10] This concession is consistent with the declaration of Barry
   Levin, a former Shareholder and head of Heller's litigation
22 department, that he was "not aware of a single instance in which
   Heller ever took the position that it was legally entitled to
23 recover any portion of fees that the new firms would earn for
   their work on hourly rate matters" when a Shareholder was leaving
24 the firm. *See* Declaration of Barry Levin at paragraph 6 (Docket
   No. 81 in A.P. No. 10-3234). Nor could he "recall a single
25 instance in which anyone in Heller management ever took the
   position that the firm's governing corporate documents required
26 any former Heller shareholder to pay Heller some share of profits
   that he or she might earn at their new law firm for working on
27 hourly rate matters they previously had worked on at Heller." *Id*.

28
                                  -9-

dissolution were departing Shareholders burdened with a duty to account for unfinished business taken from the firm. The Jewel Waiver purported to eliminate that duty to account, freeing the Shareholders to keep profits earned on unfinished business.

Finally, counsel for Heller also acknowledged that a law firm that took unfinished business from Heller without a Shareholder concurrently joining it would have no exposure under Heller's fraudulent transfer theories.

D. *Issues Previously Decided in Brobeck or the 2011 Decision*

The principal arguments made by Heller in the MSJs and by Defendants in their defenses to the MSJs and their cross-motions are discussed below. There are several issues, however, that the court has already addressed either in the 2011 Decision or in *Brobeck,* and will not revisit or address at length now. They are, in turn:

    1.  Unfinished Business Is Property of Heller.

As stated in *Brobeck*, unfinished business of a law partnership is any business covered by retainer agreements between the firm and its clients for the performance of partnership services that existed at the time of dissolution. It includes matters in progress but not completed when the firm is dissolved, regardless of whether the firm was retained to handle the matter on an hourly or contingency basis. *Brobeck*, 408 B.R. at 333.

New business for the former Heller clients is not property of Heller that can be the subject of the fraudulent transfer action. *Id.* What constitutes unfinished business is to be determined on the date of dissolution of the firm, not based upon events occurring thereafter. *Id.* Unfinished business was property of

-10-

Heller until relinquished by the Jewel Waiver. *Id.; see also Development Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP (In re Coudert Brothers LLP),* 480 B.R. 145, 160-61 (S.D.N.Y. 2012)(applying New York law, court denied summary judgment in favor of defendant law firms, holding that former partners of debtor had a duty to account for unfinished business and that the completion of unfinished business was "within the scope of the business of the firms they joined." Those firms were therefore "jointly liable for an accounting[.]").

      2.   <u>No California Rules of Professional Conduct Are Violated by Prosecution of These Actions against Defendants</u>.

In the 2011 Decision, the court resolved the issue of whether a recovery in these actions would violate the fee-sharing prohibitions of the California Rules of Professional Conduct, concluding that there is no impermissible fee sharing if a bankruptcy estate recovers profits earned on unfinished business by a fraudulent transfer defendant. *Heller*, 2011 WL 1539796 at *5; *see also Anderson, McPharlin & Connors v. Yee*, 135 Cal. App. 4th 129 (2005).

      3.   <u>There Were No Transfers of Clients or Interference with Clients' Rights</u>.

A *sine qua non* of the potential liability of Defendants is that the client for whom unfinished business was being performed consented to having that business transferred to and completed by one of Defendants. Heller concedes, and the court concurs, that without that client's consent there would be no fraudulent transfer liability because Heller's unfinished business would not have been completed by any Defendant. That transfer with consent is not relevant to the legal analysis, but merely a factual

-11-

predicate to the application of the fraudulent transfer theory to these cases. Stated otherwise, the client's transfer of the business to Defendants is necessary, but it is not the transfer that Heller seeks to avoid. The critical transfer here is that which occurs when the Shareholder, having been the immediate transferee of the Jewel Waiver, joins the Defendant law firm and brings along the unfinished business free of the duty to account.

4. <u>There Are No Fiduciary Duty Implications</u>.

One of the Defendants argues at length that it had no fiduciary duty to Heller. The court agrees. Heller has not asserted that these Defendants violated any fiduciary duty to it. Rather, it asserts that the Jewel Waiver freed or "unencumbered" the unfinished business from the Shareholders' fiduciary duty to account for profits earned in completing that business, and thus allowed Defendants to take that same business, without the "encumbrance" of having to account for it as otherwise required by *Jewel* and RUPA.

5. <u>Client's Right to Choose Law Firm Is Not Implicated</u>.

The right of a client to choose its lawyers is not implicated here. The clients had the right to discharge Heller before the dissolution; as noted above, they had the right to have their unfinished business completed by a firm that did not take on a Shareholder. The clients' decisions to have the Defendants complete the unfinished business are theirs exclusively and absolutely. But Heller is not challenging those rights; it is challenging the right of Defendants to keep profits (measured after allowing reasonable compensation) for completing Heller's unfinished business for which Shareholders (including those

-12-

retained by Defendants) would have to account absent the Jewel Waiver.

   6.   <u>Whether a Discharged Attorney Can Recover Fees from Former Client Is Immaterial</u>.

   Defendants' argument that a discharged attorney cannot recover more than reasonable fees for past performance from a former client is yet another red herring.  Whether or not a discharged attorney may sue a former client is not the point.  As noted, the unfinished business was finished, perhaps at a profit, by Defendants and the former attorney (Heller) is suing to recover fraudulently obtained profits from Defendants, not fees from Defendants' clients.  Further, despite what one Defendant argues, no departing Shareholder exercised rights, or could have exercised rights, over the fees paid to any Defendant on account of Heller's unfinished business.  That does not prevent Heller from seeking those profits.

   7.   <u>Heller Could Not Finish the Unfinished Business</u>.

   Defendants argue that because Heller was not capable of finishing its unfinished business, it had no value to the estate.  Obviously, given that Heller dissolved, it could not finish pending business;  Heller has not contended to the contrary.  Nevertheless, as noted in *Brobeck* and plain from Heller's argument here, these actions are all about Defendants' profits on unfinished business and whether or not Heller's creditors have been deprived -- by virtue of the Jewel Waiver -- of an accounting and recovery of profits contemplated by RUPA and *Jewel.*  Heller's inability to perform does not render its right to an accounting of unfinished business valueless.  Otherwise, RUPA and *Jewel* would

-13-

have no meaning; there would be no "unfinished business doctrine."

III.   <u>ISSUES</u>

Despite the sequence of issues briefed and argued on the MSJs and cross-motions, the court will first examine whether Heller has made a prima facie case for a fraudulent transfer from it to the Shareholders by virtue of the Jewel Waiver.  If not, then Defendants, as subsequent transferees, can have no liability.[11]  If there was a fraudulent transfer, then Defendants may not be liable for the avoided transfers if they come within the safe harbor of section 550(b).

The issues will be addressed as follows:

**1.  Did the Shareholders Provide Heller with a Contemporaneous Exchange of Reasonably Equivalent Value?**

**2.  At the Time of the Jewel Waiver, Was Heller Incurring Debts Beyond Its Ability to Pay?**

If both of these questions are answered in Heller's favor, then the remaining issues to be discussed are:

**3.  Do Defendants Have Affirmative Defenses Under § 550(b) or**

---

[11] Section 550(a) provides, in part:

Except as otherwise provided in this section, to the extent that a transfer is avoided . . ., the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

    (1)  the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

    (2)  any immediate or mediate transferee of such initial transferee.

Section 550(a)(2) refers to "any immediate or mediate transferee of [the] initial transferee."  The court finds the term "subsequent transferee" to be more descriptive and will use it here in place of "immediate or mediate transferee."

-14-

**California Civil Code § 3439.08(b)(2)?[12]**

> **a.   Did Defendants Take for Value?**
>
> **b.   Did Defendants Take in Good Faith and Without Knowledge of the Avoidability of the Jewel Waiver?**

## IV.   DISCUSSION

A.   *Summary Judgment Standards*

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56 (incorporated by Fed. R. Bankr. P. 7056); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although a "mere scintilla of evidence" is insufficient, "the issue of material fact . . . is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *Anderson v. Liberty Lobby*, 477 U.S. at 248–49.  Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," the "evidence of the

---

[12] That subsection prevents a fraudulent transfer judgment from being entered against "any subsequent transferee other than a good faith transferee who took for value . . . ."

-15-

1  non-movant is to be believed, and all justifiable inferences are
2  to be drawn in [its] favor." *Id.* at 255.
3  B.   *Elements of Fraudulent Transfer*
4       For Heller to prevail on its claims for a constructively
5  fraudulent transfer under section 548 by the MSJs, it must
6  establish the existence of four elements: (1) the transfer must
7  have involved property of the debtor; (2) the transfer must have
8  been made within two years of the filing of the petition; (3) it
9  must not have received reasonably equivalent value in exchange for
10 the property transferred; and, of particular relevance to the
11 MSJs, (4) it must have intended to incur, or believed that it
12 would incur, debts that would be beyond its ability to pay as such
13 debts matured.  11 U.S.C. § 548(a)(1)(B)(ii)(III).  To succeed on
14 its claim under Cal. Civ. Code § 3439.05, Heller must prove
15 essentially the same elements. *Brobeck*, 408 B.R. at 347.
16      The court has already dealt with the first element and the
17 second is not an issue in these actions.
18 C.   *Disposition*
19      1.   **Shareholders Did Not Provide Reasonably Equivalent Value**
            **In Exchange for the Jewel Waiver.**
20
21      In *Brobeck*, the court was not swayed by the defendants'
22 argument that the initial transferees (the partners) had provided
23 reasonably equivalent value in exchange for the Jewel waiver.  The
24 court specifically rejected the notion that the partners'
25 performance of what they were already obligated to do or provide
26 was not an exchange of value reasonably equivalent to those
27 property rights released by the firm by virtue of the waiver. *See*
28 *Brobeck*, 408 B.R. at 344.  Similarly here, the Shareholders'

-16-

performance of pre-existing legal and ethical duties to clients or to Heller (such as collecting accounts receivable, returning files to clients and assisting in transition of client matters) is not value given "in exchange for" the Jewel Waiver.

Unlike in Brobeck, the Dissolution Agreement stated on its face that Heller was waiving its claims under *Jewel* in order to encourage Shareholders to move their clients to other law firms and to move associates and staff with them, "the effect of which will be to reduce expenses to [Heller], and to assure that client matters are attended to in the most efficient and effective manner possible, and to help ensure collection of existing accounts receivable and unbilled time with respect to such clients[.]"[13]   In fact, Heller itself introduced evidence of internal Heller communications in which Shareholders discuss the reluctance of other firms to take on Heller attorneys and staff in the absence of a waiver. *See* Exhibit 43 to the Declaration of Chris Sullivan filed on June 18, 2012 (Docket No. 79-11 in A.P. No. 10-3221) ("A number of firms involved here are acutely aware of the *Jewel v. Boxer* problem.  They will want some assurance that they won't get

---

[13] This intent was reiterated by Peter Benvenutti ("Benvenutti"), the chairman of Heller's Dissolution Committee, in his deposition. Heller's goal was to "realize the maximum value on accounts receivable" by facilitating the "orderly transition of lawyers and clients to new firms" so that clients would pay outstanding bills.  *See* Benvenutti Depo. at pages 95-97, attached as Exhibit A to the Declaration of Aaron Agenbroad (Docket No. 127-5 in A.P. No. 10-3221).  Benvenutti further testified that the *Jewel* provision was based on a "judgment that [it] would be the most effective way" for lawyers and clients to find new homes. *Id.* at 130-131.  He also stated that the potential *Jewel* claims were of "low and dubious value," (*id.* at 97) and the waiver "enhanced the collectability" (*id.* at 99) of accounts receivable, so the inclusion of the waiver was "essentially a no-brainer." *Id.* at 100.

-17-

trapped in that net. If we suggest otherwise as seems to be implicit in the discussion below, they will simply opt out with no jobs for individuals and nothing for the firm.").

Defendants contend, therefore, that the waiver provided indirect but contemplated benefits to Heller, citing *Frontier Bank v. Brown (In re N. Merchandise, Inc.),* 371 F.3d 1056 (9th Cir. 2004) (in turn citing *Harman v. First Am. Bank (In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d 479, 485 (4th Cir. 1992)). The court does not disagree; the Jewel Waiver did remove a potential impediment to the movement of attorneys and staff to other firms. Moreover, it is undisputed that the Jewel Waiver facilitated an orderly dissolution, and it is undisputed that the Shareholders had no pre-existing duty to assist in the transition of attorneys and staff to other firms.

Defendants have attempted to quantify the benefits obtained from such an orderly dissolution, and the court accepts as true for the purposes of these motions the evidence that they have presented. Jones Day demonstrated that by encouraging Shareholders to assist associates and staff in finding new jobs (which was not a duty imposed by law or ethics), Heller was able to reduce potential WARN Act claims significantly. *See* Exhibit 1 to Declaration of Robert P. Mosier ("Mosier") at page 7 (Docket No. 129-4 in A.P. 10-3221).[14] More specifically, Mosier said that the orderly dissolution permitted collection of 62 percent of accounts receivable, as opposed to 35-40 percent in a mismanaged

---

[14] Mosier's declaration quantifies the savings realized by Heller as a result of a quicker placement of staff and associates; that amount is under seal.

-18-

environment. *Id.* He also said that the use of a Jewel provision "helps expedite clients' efforts to obtain new counsel by eliminating perceived impediments or disincentives that could impact some (but certainly not all) other firms' willingness to take on matters for which the clients previously engaged the dissolving firm." *Id.,* at Exhibit 1 (Page 3). "Whether [Heller] defines the 'property' to be the active client matters ongoing at Heller as of September 26, 2008, or the future profit from any such matters, it is my view that the value of that property to Heller as of the date of dissolution was, at best, zero." *Id.* at 4. Because Heller had "no way to recognize any value from those matters as of September 26, 2008[,]" the "matters remaining at Heller as of the date of its dissolution were, if anything, a liability and not an asset of the firm." *Id., at 6.*

Although Mosier speculated that the value of the profit on future work on unfinished business was difficult to assess and had to be placed at zero, he also conceded that such an assessment would "require a significant investment of professional time", *Id.,* time that neither he nor Defendants did invest. That concession undermines, even contradicts, his valuation at zero. The analysis that Mr. Mosier said would require significant professional investment might well be followed with an analysis of those significant revenues.[15]

---

[15] Other expert declarations do not quantify the value provided by Shareholders in exchange for the Jewel Waiver, but instead address generally the benefits provided by the Shareholders or address the amount of damages recoverable by Heller. *See, e.g.,* Exhibit A to the Declaration of David J. Teece (Docket No. 129-18 (Redacted Version) in A.P. 10-3221) (also discussing policy reasons why Heller's claims should fail); Exhibit A to the Declaration of Michael J. Wagner at pages 1-15

-19-

Of course, this expert testimony values an orderly dissolution as opposed to a disorderly one; it does not specifically quantify the value of benefits provided *in exchange for* the Jewel Waiver itself. That missing link, as discussed below, underlies the reason why the court is granting partial summary judgment in favor of Heller on this issue.

Despite presenting evidence of indirect benefits provided by the orderly dissolution, Defendants have not introduced *any* evidence to dispute Heller's contention that the Shareholders did not give that value *in exchange for* the Jewel Waiver.[16] There is no evidence that any Shareholder would have refused to execute the Dissolution Agreement absent the Jewel Waiver. No Shareholder has declared that he or she would not have participated in an orderly dissolution without the Jewel Waiver. Without any evidence that the Jewel Waiver was given *in exchange for* cooperating with an orderly dissolution and thereby linking the indirect benefits described by Mosier and others to the Jewel Waiver itself,

(Docket No. 129-12 (Redacted Version) in A.P. 10-3221) (also opining that the value of the unfinished business to Heller was zero); Exhibit A to the Declaration of David Nolte at Section II (Docket No. 140 (Redacted Version) in A.P. No. 10-3234); Exhibit A to the Declaration of Brad Hildebrandt (Docket No. 111 (Redacted Version) in A.P. No. 10-3234).

[16] Jones Day did introduce a declaration of Leslie D. Corwin, an attorney Heller retained to assist in the dissolution process, stating that he believed the Jewel Waiver "encouraged votes" for the Dissolution Plan "in exchange for Heller's agreement "not to assert a *Jewel*-type claim[,]" particularly as Shareholders could have left the firm prior to dissolution without having to account for profits earned by the attorney's new firm. See paragraph 12 of the Declaration of Leslie Corwin, attached to Jones Day's second motion for counter-motion for summary judgment (Docket No. 127-2 in A.P. No. 110-3221). Mr. Corwin did not identify any Shareholder that conditioned a vote and performance on the waiver, and what Mr. Corwin believes is of no significance absent definitive evidence.

-20-

Defendants cannot establish the existence of material fact to defeat Heller's MSJ on this issue.

Defendants also suggest that the Jewel Waiver had little value as clients had the right to take unfinished business to firms without former Shareholders. Here, though, Shareholders did go to Defendants, taking the business with them. All of the Defendants have conceded that their revenues for billings of Heller's unfinished business are considerable, every one of them in seven or more figures.[17] The connection between a Shareholder who joined a Defendant and the unfinished business that came with that Shareholder and was completed by that Defendant is inescapable, particularly in light of Mosier's view of what significant professional investment might reveal.

Beyond that, Jones Day argues that:

> In addition to encouraging shareholders to vote for a prompt and orderly dissolution, the Jewel provision also benefitted Heller by removing any perceived risk of potential Jewel liability.

Jones Day Memorandum (Docket No. 129-2 in A.P. 10-3221 at 11:20-21).

This statement is difficult to understand. Heller had no "potential Jewel liability", as in fact it was the entity who, but for the Jewel Waiver, might have been able to recover the value of unfinished business from departing Shareholders. The alleged fraudulent transfer caused by the Jewel Waiver is exactly what Heller as liquidating debtor now pursues.

At oral argument counsel for Davis and Foley presented a novel twist to the argument that the Jewel Waiver had no value

---

[17] The precise numbers are under seal.

-21-

because it effected no change (i.e., the Shareholders were free to leave with unfinished business before the dissolution, and the Jewel Waiver maintained that status quo). Counsel argued that by the contemporaneous acts of (1) foregoing the right to simply walk away with unfinished business without the duty to account and (2) executing the Dissolution Plan containing the Jewel Waiver, the Shareholders exchanged reasonably equivalent value. The court is not persuaded, for the same "cause and effect" reason discussed above. There is no evidence to support that contention. No Shareholder has stated that he or she would have walked away with unfinished business prior to execution of the Dissolution Agreement if the waiver had not been included. While the Shareholders may not have had a duty to account prior to dissolution, Heller's failure and attendant dissolution imposed that duty. Waiving that post-dissolution duty is not the equivalent of being free of a pre-dissolution duty.

More importantly, the theory overlooks that fact that the adoption of the Dissolution Plan triggered fiduciary duties then imposed on the Shareholders that required them to account for unfinished business; the Jewel Waiver abolished that duty. While the same document contains both the operative provisions for dissolution and the Jewel Waiver, conceptually the circumstances of the firm's financial failure and attendant dissolution were necessary predicates to the waiver of accountability for the unfinished business. The court also rejects that version of the reasonably equivalent value argument.

-22-

2. **At the Time of the Jewel Waiver, Heller was Incurring Debts That Were Beyond Its Ability To Pay.**

Heller's complaints include alternate claims for relief based upon the Jewel Waiver being a constructive fraudulent transfer, either under § 548 or California Civil Code §§ 3439.04, 3439.05, and 3439.07. Heller argues that it "was unable to pay its debts as they became due," and that it "repeatedly acknowledged it lacked the ability to pay debts that were due." By way of factual support for those similar contentions, Heller offers the declaration of Paul Soulier ("Soulier"), who is a certified public accountant and was employed by Heller from 2001 through 2010; he became Heller's Assistant Controller in 2007.

Defendants, primarily through Orrick, counter Soulier's declaration with the declaration of Richard Holdrup ("Holdrup"), the chief financial officer of Heller from January 2006 through October 2008. The challenge for the court is to determine whether the two competing declarations establish disputed *material* facts. They do not, so Heller is entitled to summary judgment on this issue.

In its initial memoranda of points and authorities in support of its MSJs, Heller's insolvency argument contains a caption that states "[a]t the the time of the Jewel Waiver, Heller could not pay its debts as they become [sic] due." Despite the title, the substance of the argument focuses more narrowly on § 548(a)(1)(B)(ii)(III), which applies when a debtor "intended to incur, or believed that [it] would incur, debts that would be beyond the debtor's ability to pay as such debts mature." Heller also cites California Civil Code § 3439.04, applicable where a

-23-

transferor "intended to incur, *or believed or reasonably should have believed* that he or she would incur, debts beyond his or her ability to pay as they became due."  In other words, California law permits a court to apply an objective test to determine whether a debtor made a transfer when it "reasonably should have believed" that it would incur debts beyond its ability to pay, while the section 548(a)(1)(B)(ii)(III) inquiry is limited to the debtor's subjective intent or belief.

From the thrust of the argument in its memorandum, Heller is clearly relying on Heller's subjective belief as to whether it would incur debts beyond its ability to pay as they matured.  The issue is narrowly described by Heller, and therefore any general question about whether Heller was or was not able to pay its debts after the Jewel Waiver are not pertinent for the purposes of the MSJs.

Heller has offered uncontroverted evidence that as of the time of the Jewel Waiver, it owed no less than $44 million to Bank of America.  As of that time, Bank of America had taken control of Debtor's cash and receivables and Heller had no ability or authority to pay various debts, including over $500,000 due to retired shareholders, and several million dollars to various trade creditors including Williams Lea (owed $2 million).  It also had substantial liability to its landlords, with whom it hoped to negotiate some resolution sometime in the future.  Addressing the dire financial picture, Benvenutti (on behalf of the Dissolution Committee) sent a memorandum to Heller's retired shareholders on September 27, 2008:

Our efforts have thus far been unsuccessful, and the result

-24-

is that the firm does not have available funds with which to make the scheduled payments to you.

*See* Exhibit 34 to Declaration of Christopher Sullivan (Redacted) (Docket No. 79 in A.P. 10-3221).

From the foregoing and other evidence in Soulier's declaration it appears that Heller was cash flow insolvent on the date of the Jewel Waiver. The question in the MSJ, though, is whether that satisfies Heller's burden under the subjective test of § 548(a)(1)(B)(ii)(III) or the objective test of California Civil Code § 3439.04(2)(B). Orrick argues that the so-called "intent or belief" test of those sections only looks forward to determine whether a debtor could pay debts incurred after the transfer. Intending to pay or paying future debt in full while making no or partial payments on existing debt *is* incurring debt beyond the debtor's ability to pay, whether a subjective or objective test of intent or belief is applied.

Heller could not have reasonably believed that it could pay its future debts (including the costs of liquidation) as they became due, on top of the debts already due; the objective test of the California Civil Code thus cannot be satisfied. Holdrup's declaration does not satisfy a subjective test either, as it does not take into account the deferred trade debt, the long-term lease obligations and fact that the entire secured bank debt was presently due and owing. While he and Heller management may have had some optimism that the firm's Dissolution Plan would work out to retire the bank debt in full, they had nothing more than a hope to resolve Heller's long term obligations to the landlords and they had no present expectation of satisfying the firm's

-25-

obligations to the trade debt and the retired shareholders. Thus, the facts set forth by Holdrup's testimony are not material in that they would have no bearing on the ultimate outcome of this issue.

Defendants' argument that Heller could pay future debts on or after the date of the Jewel Waiver is unrealistic and not supported by law. Obligations due prior to that date do not just disappear in the analysis and in fact if a debtor is unable to deal with existing obligations then the situation falls within the reach of § 548(a)(1)(B)(ii)(III) and California Civil Code § 3439.04(a)(2)(B). Accordingly, Heller's MSJs must be granted on this issue.

In light of these dispositions the court addresses the remaining issues.

### 3. <u>**Defendants Do Not Have Affirmative Defenses Under § 550(b) or California Civil Code § 3439.08(b)(2)**</u>[18]

Section 548 authorizes the court to avoid a constructive fraudulent transfer. Once a transfer is avoided, section 550, in turn, authorizes a trustee (or one vested with the powers of a

---

[18] Section 550(b) provides:

(b) The trustee may not recover under section (a)(2) of this section from --

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

California Civil Code § 3439.08(b)(2) allows judgment to be entered against "any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee."

-26-

trustee) to recover the value of the property transferred (here,
the absolute right to retain profits from Heller's unfinished
business without having to account for them as required under
*Jewel)* from initial transferees or those for whose benefit the
transfer was made.  A trustee can also recover the value of the
transferred property from subsequent transferees, although such
recovery is prohibited if the subsequent transferee takes for
value, in good faith, and without knowledge of the voidability of
the transfer.  11 U.S.C. § 550(a) & (b);  *Danning v. Miller (In re
Bullion Reserve of N. Am.)*, 922 F.2d 544, 547-48 (9th Cir. 1991).

Defendants were not the initial transferees of the benefits
of the Jewel Waiver – the Shareholders were.[19]  Moreover, the Jewel
Waiver was executed for the benefit of the Shareholders.  The
Defendants were at most subsequent transferees of the benefits of
the Jewel Waiver.  Certainly, Defendants benefitted from the
waiver, but that benefit was secondary to that received by the
Shareholders.  As the Ninth Circuit stated in *Bullion Reserve*: "A
subsequent transferee cannot be an entity for whose benefit the
initial transfer was made, even if the subsequent transferee

---

[19]    In a somewhat incongruous argument, Jones Day contends
that the Shareholders, having no right to control the fees
ultimately earned on unfinished business, were mere conduits,
exercising no control, and therefore could not be initial
transferees.  As Heller points out, this works more to Jones Day's
detriment and to Heller's advantage, because there is ample
authority for the proposition that if the initial transferee is in
fact a conduit, a subsequent transferee has liability under
§ 550(a) without the safe harbor of § 550(b).  *See, e.g.,
Universal Service Administrative Co. v. Post-Confirmation
Committee of Unsecured Creditors of Incomnet Communications Corp.
(In re Incomnet, Inc.)*, 463 F.3d 1064 (9th Cir. 2006).  Because
the court does not believe that any Defendant was an initial
transferee, it will consider all of the safe harbor defenses
available to a subsequent transferee.

-27-

actually receives a benefit from the initial transfer." *Id.* at 548. Therefore, as subsequent transferees,[20] Defendants are entitled to assert the "safe harbor" defenses of section 550(b)(1).

Defendants cannot be liable at all if there was no transfer to them. In its opening Memorandum of Points and Authorities In Support of the MSJs, Heller makes little or no meaningful analysis of whether and how there was a second transfer of Heller's unfinished business to Defendants. At oral argument counsel for Jones Day repeatedly asked, "Where is the transfer?" There clearly was no transfer of any retention agreements between any Defendant and clients who had unfinished business at Heller. There was no transfer of Heller's right to bring any claims against Shareholders, as that is a claim that did not even exist until Heller filed Chapter 11 and obtained all of the powers of a trustee in bankruptcy under section 1107. Further, there was no transfer of any Jewel claim against any Shareholder.

Instead, as noted previously, the Jewel Waiver transferred to Shareholders the right to complete unfinished business free of any burden to account back to Heller for profits made on that business. The unfinished business was stripped free and clear of any obligations for the departing Shareholder to account for his or her profits. In turn, Defendants took the unfinished business unencumbered from the burden of accounting for profits realized

---

[20] Heller may still contend that Defendants, or at least some of them, could be liable under § 550(a)(1) as parties "for whose benefit such transfer was made" but that issue was not raised on the MSJs and the court has expressed some doubt as to the viability of such a contention.

-28-

from it.

In this context, however, the court must consider what has been admitted by Heller: Heller would have no claims against Defendants if the clients had transferred business to them and they had not hired or retained a Shareholder. It is the act of employing or retaining the Shareholder that is foundational to the potential liability, and the court must determine whether Defendants gave value to the Shareholders for the unfinished unencumbered business.

Under *Jewel*, absent the Jewel Waiver, the Shareholders would have had to account for profits earned on unfinished business and so would Defendants.[21] They have offered no authority that a transferee of unfinished business would not have to account to the Heller, as is the case in Coudert. If a firm taking on a Shareholder could be held to account for profits earned on unfinished business, it follows that it could be liable under § 550(a)(2) as a subsequent transferee of that fraudulently

_____

[21] The parties have not addressed the issue of whether Defendants could be liable for unfinished business profits apart from the application of federal or state fraudulent transfer law. If the court ultimately avoids the Jewel Waiver as a fraudulent transfer, the duty to account is restored. Plaintiff has not contended that Defendants would be jointly liable (as suggested in *Coudert)* for such profits, even if they could successfully invoke the good faith defense. The district court in *Coudert,* which is not a fraudulent transfer case but simply an action for accounting of unfinished business, held that firms to which Coudert partners moved could be jointly liable with those partners for profits from Coudert's unfinished business: "The Former Coudert Partners' duty to account to Coudert arose as they completed the Client Matters and earned fees thereon, and these actions were within the scope of the business of the Firms they joined. Thus, the Firms are jointly liable for an accounting, and there is no need to join the Former Coudert Partners individually under Federal Rule of Civil Procedure 19." *Coudert,* 477 B.R. at 350.

-29-

transferred unfinished business.

The transfer Jones Day searches for is the transfer of the unfinished business from the Shareholder to his or her new firm, free of any burden to account for profits. With that backdrop, the court addresses the affirmative defenses available to Defendants.

### a. Defendants Did Not Take for Value.

To prevail under section 550(b)(1), Defendants need not demonstrate that they gave reasonably equivalent value, but simply that they gave value for the transferred property. "The 'value' required to be paid by the subsequent transferee is merely consideration sufficient to support a simple contract . . . . There is no requirement [of] . . . a reasonable or fair equivalent." *Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.)*, 333 B.R. 205, 236 (S.D.N.Y. 2005); *see also Anderson v. SunTrust Mrtg., Inc. (In re Judd)*, 471 B.R. 839, 847 (D. S.C. 2012) ("'Value,' within meaning of 'good faith for value' need not be reasonably equivalent value, but only consideration sufficient to support a simple contract."), both cases citing *Collier on Bankruptcy*, at ¶ 550.03(1).[22]

The defense is available to a transferee that "takes for value." That raises the question: Takes what? In the context of the interplay between § 548 and § 550, the only inference to make

[22] Heller notes that a few courts have concluded that "value" under § 550(b) means the same thing as "reasonably equivalent value" under § 548(a). The court disagrees. To interpret section 550(b) to require reasonably equivalent value would violate the fundamental principle of statutory construction that the court should not "treat as surplusage statutory terms" by reading different terms in the same statute to have the same meaning. *Bailey v. United States*, 516 U.S. 137, 145-46 (1995).

-30-

this defense available is that the defendant takes the transferred property from the initial transferee for value. As observed in *Brady v. Bestworth-Rommel, Inc. (In re Johnson)*, 357 B.R. 136, 141 (Bankr. N.D. Cal. 2006), the first element of section 550(b)(1) is that the subsequent transferee "must have received the transfer for value."

The court follows the Ninth Circuit's lead in *Barclay v. Mackenzie (In re AFI Holding, Inc.)*, 525 F.3d 700 (9th Cir. 2000), by delving beyond the form to the substance of a transaction to determine if value was given. By considering the substance of the transactions the court concludes that as a matter of undisputed fact, the Defendants provided no value for the receipt of the unfinished business, whether or not they had knowledge of the unencumbering of the unfinished business by the Jewel Waiver.

The transfer in question is the receipt of unfinished business brought by the Shareholders to Defendants, free of any obligation to account for that business. Defendants have not shown that they provided value for the unencumbered unfinished business that they received.

Defendants bestowed many benefits upon the Shareholders and staff who joined them, namely a place to practice law, reasonable compensation, and a home for the clients and the staff who were with them and Heller. These benefits constitute "value," but Defendants' own arguments reflect that these benefits would have been provided even without the unfinished business and without the benefits of the Jewel Waiver.

First, Jones Day goes to great lengths in its cross-motion to stress that the Jewel Waiver was not even "on the radar screen,"

-31-

and was of no concern to the firm's management.  It does not
select lateral partners based on their purported books of
business.  (*See* Jones Day's Memo (Docket No. 113 in A.P. 10-3221).
If Jones Day truly did not care about the Shareholders' books of
business or about the Jewel Waiver, any value it provided the
Shareholders necessarily had to be for something other than
Heller's unfinished business.   Nothing was given by Jones Day to
any former Heller Shareholder who joined it because of the waiver
and the unfinished business brought along.

     The court can only conclude that Jones Day "took" the
unfinished business for no value and thus cannot avail itself of §
550(b)'s safe harbor.  Shareholders joined Jones Day whether or
not there was a Jewel Waiver, and nothing was given in return for
it.  This defense fails.

     The same is true with Orrick.  It stresses that it
compensated its incoming former Heller Shareholders at market
levels of compensation but without linking that compensation in
any way to consideration for the unfinished business.  The factors
to determine the incoming Shareholder's compensation were not at
all related to any profits on the unfinished business.  This
defense fails for Orrick as well.

     Davis takes a different approach.  First, it repeats what is
undisputed, namely that the "take for value" element of this
defense need only be contractual consideration.  It then stresses
that the value it conferred upon the Shareholders it acquired came
from its commitment to provide just over one and one-half million
dollars in capital required to finance start-up costs for taking
on the Shareholders and staff, and at a time when Davis was

-32-

experiencing a significant fourth quarter fiscal shortfall. Davis does not say that the Shareholders were given anything for the unfinished business. Instead it stresses that distributions to its members are a "direct result of the active time, effort and capital invested by them in the firm's business," offering nothing about unfinished business other than the argument that it remains premature to establish the value of "property allegedly transferred by the Jewel provision to determine equivalence."

It concludes the portion of its argument by stressing that, assuming the Jewel provision has any value at all, the calculation of that value will require quantifying the unfinished business, the fees generated on it, and the likely profit from it. This is exactly the calculation of damages that the court reserved in *Brobeck* and that is premature here. That calculation is not relevant to the current MSJs and cross-motions; it will be the subject of further proof, presumably at trial.

In summary, whereas Davis does not emphatically stress that it knew nothing about the Jewel Waiver, and thus could not have given value for it, it provides no evidence of value given for the unfinished business that the Heller Shareholders brought to it along with the clients for whom the work on the unfinished business would proceed. This defense fails for Davis as well.

Finally, Foley first argues (incorrectly) that Heller contends that the value for the subsequent transfer must have been paid to it. Not only did Heller not argue it, the court has rejected that theory.

In response to Heller's reliance on a Foley witness who did not think Foley was paying anything for unfinished business, Foley

-33-

argues that it "was not actually purchasing unfinished business from the Shareholders - and would have no reason to believe that it was." Conceding that the Shareholders transferred business to Foley, Foley then argues that that transfer should be in exchange for value in the form of compensation agreed to be paid and paid to the Heller Shareholders at Foley. That argument, of course, has been rejected as to the other Defendants and equally is unavailing to Foley.

Foley does cite *AFI Holding* for the proposition that the bankruptcy court may delve beyond the form to the substance of a transaction to evaluate an exchange of consideration. The court has done that. Foley offers no facts to support that the substance of the subsequent transfer of the unfinished business was for value. As with Davis, Foley contends that quantifying the value of the subsequent transfer is a fact intensive question; this is the very question that the court has already indicated is part of the measure of damages, an unresolved issue. This defense fails for Foley as well.

### b. Two Defendants Took In Good Faith and Without Knowledge of the Avoidability of the Jewel Waiver.[23]

The defenses under § 550(b) are cumulative, and to prevail, Defendants must demonstrate that they took in good faith

---

[23] Most courts have concluded that the term "good faith" is "synonymous with 'without knowledge of the voidability' so that the Bankruptcy Code's use of both creates a redundancy." *In re First Independence Capital Corp.*, 181 Fed. Appx. 524, 528 (6th Cir. 2006); *see also* 5 Collier on Bankruptcy ¶ 550.03[3], 550-23 (16th ed. rev. 2010). The parties have treated the terms interchangeably. Even if they had not, there is absolutely nothing in the record that would indicate that Defendants acted other than in good faith in hiring Shareholders and others from Heller. Thus the court will find good faith and deal only with the "without knowledge" element of this defense.

-34-

(undisputed by Heller), for value and without knowledge of the voidability of the transfer. Since they did not take for value, whether or not they had knowledge of the avoidability of the Jewel Waiver is not outcome determinative. Nevertheless, the court will address the issue based upon the record presented.

As Heller argues in its briefs, the court must apply an objective standard in determining whether a transferee took property without knowledge of the voidability of the transfer. *Hayes v. Palm Seedlings Partners (In re Agric. Research & Tech. Group, Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990).

In the context of § 550(b)(1), a party has knowledge that a transfer is avoidable if the transferee knows the transfer is the result of actual fraud, or knows facts that would lead a reasonable person to inquire further as to the avoidability of the transfer. *Kendall v. Sorani (In re Richmond Produce Co., Inc.)*, 195 B.R. 455, 463-64 (N.D. Cal. 1996). If a transferee has knowledge of facts that would indicate a particular transfer may be subject to avoidance by a bankruptcy trustee, and if further inquiry would reveal that the transfer is in fact recoverable, the transferee cannot "sit on his hands, thereby preventing a finding that he has knowledge." *Hopkins v. D.L. Evans Bank (In re Fox Bean Co., Inc.)*, 287 B.R. 270 (Bankr. D. Idaho 2002), subsequently aff'd without opinion, 144 Fed. Appx. 697 (9th Cir. 2005), quoting *Genova v. Gottlieb (In re Orange County Sanitation, Inc.)*, 221 B.R. 323, 328-29 (Bankr. S.D.N.Y. 1997) (quoting *Brown v. Third National Bank (In re Sherman)*, 67 F.3d 1348, 1357 (8th Cir. 1995)).

To possess "knowledge of the voidability" of a transfer, a

-35-

subsequent transferee must have knowledge of sufficient facts that: (1) puts transferee on notice that transfer might be avoidable; or (2) requires further inquiry into the situation, which inquiry is likely to lead to conclusion that transfer might be avoidable. *Bruno Machinery Corp. V. Troy Die Cutting Co., LLC (In re Bruno Machinery Corp.)*, 435 B.R. 819 (Bankr. N.D.N.Y. 2010) (citing *Woods & Erickson v. Leonard (In re AVI, Inc.)*. 389 B.R. 721 (9th Cir. BAP 2008).

Here, some of the Defendants knew about the Jewel Waiver and required the waiver before extending offers to the former Shareholders. Beyond that, Orrick and some of its partners who had been at Brobeck were defendants in the trustee's action in *Brobeck* and can hardly claim not to know of the assertion that the a waiver such as the Jewel Waiver was a fraudulent transfer. No one could reasonably conclude that Orrick was not on notice of the risk of exposure to fraudulent transfer liability based upon its acquisition of unfinished business from Brobeck. Orrick itself concedes that the inquiry notice test is objective, and it would be hard-pressed to deny that it was unfamiliar with the nature of the claims being asserted against it under the same theories that are pressed here by Heller.

Orrick may have thought little of the Brobeck trustee's theories, and indeed it may have thought that the case against it was nothing more than a strong-arm tactic to shake money from a well heeled defendant. But Orrick could hardly say that it had no basis to believe that a court could find fraudulent transfer - subsequent transferee liability involved in the transaction whereby it acquired partners from Brobeck. Thus, Prof. Triantis'

-36-

contention about what a firm would reasonably believe is belied by what Orrick actually believed and knew.

The court agrees with Heller that for purposes of this defense, it is sufficient that a subsequent transferee could reasonably have known that a transfer was potentially avoidable, or might be avoidable. *AVI, Inc.*, 389 B.R. at 736. *See also Enron Corp.*

Orrick's hiring partner and its general counsel knew of the Brobeck matters pending against it and knew of *Jewel*. Orrick cannot now claim a lack of knowledge on this element merely because the court had not yet issued a ruling in the adversary proceeding against and other defendants in Brobeck. The "without knowledge of the avoidability" defense fails for Orrick.

While the case for Davis is a closer call than with Orrick, the court nevertheless is satisfied on the present record that Davis had sufficient information to prevent it from prevailing on the "without knowledge" defense here.

It knew of the Brobeck bankruptcy and it knew what matters were pending against former Brobeck partners and at least one new firm based upon unfinished business, though not on a fraudulent transfer theory. It was also aware of the *Jewel* doctrine and that its malpractice carrier, ALAS, had warned of claims relating to hiring lawyers from dissolving firms. Davis knew enough to attempt to identify issues that might arise from Heller's dissolution. From the claim against Morgan, Lewis & Bockius for unfinished business, it does not take much of a leap to know that a variation on that sort of claim is the recovery of profits earned on unfinished business under a fraudulent transfer theory,

-37-

exactly as Brobeck was prosecuting against Orrick and other firms (not Davis).

Davis turned down an offer from ALAS to do a risk assessment of its acquiring Heller Shareholders. While this may have been a prudent decision at the time, in retrospect it appears that Davis turned a blind eye toward the real issue, namely whether there was any merit to the theory of fraudulent transfer applied to the recovery or profits on unfinished business.

Jones Day fares better than Orrick and Davis. All Heller can say is that Jones Day received news articles and e-mails discussing Heller's deteriorating financial condition and possible bankruptcy. Against that assertion Jones Day establishes that, much like it knew nothing of *Jewel*, it did not know that Heller and its Shareholders had executed the Jewel Waiver. It was not made aware of facts to put it on notice to do some sort of an inquiry (as is the case with Davis) even if Jones Day was aware of Heller's deteriorating financial condition. There is nothing in the present record to deprive Jones Day of this aspect of the § 550(b) defense.

Heller argues in its reply that Jones Day does not dispute that it knew of Heller's financial condition and potential bankruptcy and that bankruptcy was such a risk that it expedited its consideration of having Heller Shareholders join it. The fact that one partner at Jones Day had been sued in the Brobeck case and another had represented former Brobeck partners, is not sufficient to pass an objective test sufficient to defeat its defense under § 550(b).

Finally, Foley knew even less than Jones Day. It did not

-38-

know of the Jewel Waiver and its partners involved in recruiting Heller Shareholders did not know of the Brobeck trustee's claims. There were no facts to put Foley on inquiry notice to determine the risk of fraudulent transferee or successor transferee liability. That is so even though the managing partner of Foley's San Francisco office was a member of the firm's Bankruptcy and Business Reorganization practice group. And a brief conversation between that Foley attorney and Benvenutti, the Chair of Heller's Dissolution Committee, is not enough support an inference that can deny Foley this prong of the § 550(b) defense that it lacks the knowledge of the avoidability of the transfers by the Jewel Waiver.

## V.  DISPOSITION

From the foregoing the court is satisfied that Heller is entitled to partial summary judgment on all of the issues raised by it in the MSJs and that Defendants are not entitled to summary judgment on their cross-motions.  What remains, therefore, is proof at trial of the extent of Heller's damages, namely the amount earned by Defendants as profit on the unfinished business.

Counsel for Heller should submit identical forms of orders granting the MSJs and denying the cross-motions in each of these adversary proceedings, and should comply with B.L.R. 9021-1.

The court will conduct a status conference in these four adversary proceedings to schedule trial and take up any other matters on May 7, 2013, at 1:30 P.M.

**END OF MEMORANDUM DECISION**

-39-